UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Darlene Cooper,

    Plaintiff,

        v.                            Civil Action No. 2:17–cv–76–jmc

People's United Bank, N.A.,

    Defendant.

## <u>OPINION AND ORDER</u>
(Doc. 14)

Plaintiff Darlene Cooper commenced this civil action against Defendant People's United Bank, N.A. (PUB), seeking pension benefits that she allegedly accrued during her employment with Chittenden Bank from 1972 to 1985. (Doc. 1 at 1.) In Count One of her Complaint, Cooper claims that PUB, the successor-in-interest to Chittenden Bank, failed to "safeguard and disburse" her pension benefits as required by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461. (*Id.* at 2.) In Counts Two and Three, Cooper brings common law claims against PUB, asserting that PUB breached its duty to hold Cooper's pension in constructive trust and failed to act as bailee of the pension. (*Id.* at 2–3.)

PUB now moves for summary judgment under Fed. R. Civ. P. 56, arguing that Cooper's ERISA claim is barred by her failure to exhaust her administrative remedies following PUB's March 2016 denial of her claim for benefits. (Doc. 14.)

PUB further argues that ERISA preempts Cooper's common law claims. (*Id.*) Cooper opposes the Motion for Summary Judgment, asserting that her administrative remedies should be deemed exhausted because PUB did not follow its own claim procedures in denying Cooper's claim and, alternatively, that further administrative review would have been futile. (Doc. 26.) Cooper additionally claims that it would be premature to conclude that ERISA bars her common law claims at this early stage of the case. (*Id.*)

Concluding that Cooper failed to exhaust her administrative remedies, that further administrative review would not have been futile, and that Cooper's common law claims are preempted by ERISA, the Court GRANTS PUB's Motion for Summary Judgment.

## **Factual Background**

The following facts are taken from PUB's Motion for Summary Judgment (Doc. 14) and the attached exhibits (Docs. 14-1–14-7), Cooper's Opposition to the Motion for Summary Judgment (Doc. 26) and the accompanying documents (Docs. 26-1–26-3), and additional exhibits introduced by PUB during a December 1, 2017 hearing on the Motion for Summary Judgment.[1] (Doc. 35, Def.'s Exs. A–D.) The

---

[1] The exhibits were admitted at the December 1, 2017 hearing after Cooper's counsel did not object to their admission. (*See generally* Doc. 35); *see also* Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2721 (4th ed.) ("The court may consider any material that would be admissible or usable at trial . . . [and] [t]he parties need not formally offer their outside matter as evidence or have it marked as an exhibit at the hearing on the motion."). Aside from these materials, no other evidentiary support has been submitted by either party because the parties jointly filed a motion to stay discovery pending the resolution of this summary judgment motion. (*See* Docs. 24, 25.)

facts are undisputed except where noted[2] and, for the purposes of summary judgment, they are viewed in the light most favorable to Cooper. *See Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

## I.    Cooper's Employment History

### A.    Chittenden Bank Employment

Cooper was employed by Chittenden Bank from 1972 to 1985. (Doc. 14 at 2; Doc. 26-3 at 1, ¶ 1.) Earnings records from the Social Security Administration confirm consistent employment at Chittenden Bank during this time frame. (Doc. 26-1 at 11; *see also* Doc. 14-7 at 2.) As an employee of Chittenden Bank, Cooper was entitled to participate in the Pension Plan for Employees of the Chittenden Corporation (the Chittenden Pension Plan or the Plan), as long as she satisfied certain age and service requirements described in detail below. (Doc. 14-4 at 9.)

### B.    Vermont National Bank Employment

In 1985, Cooper left Chittenden Bank to work for Vermont National Bank, where she worked from 1985 through 1995. (Doc. 14-7 at 2.) During her employment with Vermont National Bank, she participated in the Vermont National Bank pension plan (the Vermont National Plan), which was sponsored by its corporate parent Vermont Financial Services Corporation. (Doc. 14-6.)

---

[2] For summary judgment purposes, PUB assumed the truth of certain facts in its statement of undisputed facts but reserved the right to dispute those facts if the case proceeds to trial. (Doc. 14-2 at 1 n.1.)

## II. Subsequent Bank Acquisitions

On May 28, 1998, Chittenden Bank acquired Vermont National Bank. (Doc. 14-7 at 3.) As part of this acquisition, on January 1, 2000, the Vermont National Plan was merged into the Chittenden Pension Plan. (*Id.*; Doc. 14-4 at 25–26, § 2.1(e).) Then, in January 2008, PUB acquired Chittenden Bank (Doc. 14-7 at 1), becoming the successor-in-interest to the merged Chittenden Pension Plan.[3] (Doc. 1 at 1, ¶¶ 3, 4.) As successor-in-interest, PUB acts as administrator and trustee of the Chittenden Pension Plan and administers the accrued benefits due under the Plan, including the merged Vermont National Plan benefits. (*Id.* ¶ 6; Doc. 14 at 2.)

## III. Chittenden Pension Plan Eligibility

### A. Eligibility Requirements

The eligibility requirements for the Chittenden Pension Plan are set forth in the Chittenden Pension Account Plan and the Summary Plan Description. (Docs. 14-4, 14-5.) The work hours required for an employee to begin accruing benefits are stated in Article II of the Chittenden Pension Account Plan, entitled "Membership and Service." (*See* Doc. 14-4 at 25–37, §§ 2.1–2.5.) To be eligible to participate in the Plan, an employee must have completed 1,000 service hours during the 12-month period following his or her employment date. (*Id.* at 27, § 2.2(a); Doc. 14-5 at 3.) Once an employee becomes a participant in the Plan, he or she receives a year of "eligibility service" for each calendar year the employee is credited with at

---

[3] Prior to PUB's acquisition of Chittenden Bank, the Chittenden Pension Plan was amended to freeze participation to those who were active members as of December 31, 2005. (Doc. 14-4 at 10.) Cooper's claim depends on the factual allegation that she was a plan participant prior to 2005.

least 1,000 hours of service.  (Doc. 14-4 at 29, § 2.3(a); Doc. 14-5 at 3.)  If an employee completes five years of "eligibility service," he or she has a fully vested interest in the accrued benefit.[4]  (Doc. 14-4 at 65, § 7.2(a)(ii); Doc. 14-5 at 5.)

## B.     Cooper's Eligibility

Because Cooper was separately employed by Chittenden Bank and Vermont National Bank prior to the merger of the Chittenden Pension Plan, her eligibility to receive accrued benefits under the Plan is based on her independent work for each bank.  (Doc. 14-7 at 3.)  As noted above, social security records show that Cooper worked for Chittenden Bank from 1972 to 1985.  (Doc. 26-1 at 11; *see also* Doc. 14-7 at 2.)  In her sworn affidavit, moreover, Cooper states that she "participated in a retirement plan offered by Chittenden Bank" and that she "remember[s] vesting in the pension plan."  (Doc. 26-1 at 1, ¶¶ 3, 4.)  Further, she recalls that she "reach[ed] a milestone of having $10,000 invested towards . . . retirement."  (*Id.* ¶ 5.)  Aside from the social security records and her personal recollection, however, no documents in the record demonstrate that Cooper satisfied the eligibility requirements and accrued benefits while employed at Chittenden Bank.  (*See, e.g.*, Doc. 26-3 at 1, ¶ 2; Doc. 14-4 at 65, § 7.2(a)(ii).)  By contrast, the record clearly demonstrates that Cooper participated in the Vermont National Plan, that she accrued benefits, and that PUB distributed those benefits.  (*See* Doc. 14-7 at 3.)

---

[4]  Similarly, prior to the Chittenden Pension Plan freeze, an employee received one year of "benefit service" for each calendar year after he or she reached at least 1,000 service hours.  (Doc. 14-4 at 33, § 2.4(a); Doc. 14-5 at 3.)  Each December 31, the Chittenden Bank credited an "Annual Pay Credit" to an employee's pension based on the employee's age plus the years of "benefit service." (Doc. 14-5 at 3.)

## IV.    Chittenden Pension Plan Claims Procedures

### A.    Claims Procedures

The Chittenden Pension Account Plan and the Summary Plan Description describe the claims procedures under the Plan.  (Docs. 14-4, 14-5.)  PUB, as the Plan Administrator, has the "exclusive right and discretionary authority . . . to interpret the Plan and decide matters arising hereunder in the administration and operation of the Plan."  (Doc. 14-4 at 94, § 11.6.)  Under the claims procedures, a claimant seeking distribution of his or her accrued benefits generally begins by contacting the Plan Administrator's Human Resources (HR) department via telephone at least 180 days before the claimant wishes to receive benefits.  (Doc. 14-5 at 14.)  In response, the Plan Administrator provides a notice of benefits containing a computation of accrued benefits and requests that the claimant elect a method of benefit distribution.  (*Id.* at 16.)  The claimant then submits a formal claim for benefits, which must be in writing.  (*Id.*; Doc. 14-4 at 92–93, § 11.4.)  If a claimant disagrees with the accrued-benefits computation, the claimant must submit a claim in writing or electronically within 60 days after the claimant receives notice of the benefits.  (Doc. 14-5 at 16.)

If this claim for benefits is denied, the Plan Administrator is required to notify the claimant within 90 days of the denial, setting forth the reasons for the denial, specifically referencing the provisions of the Chittenden Pension Plan on which the denial is based, describing any additional materials that the claimant must submit to perfect the claim, and explaining the claims review procedure.

(Doc. 14-4 at 92–93, § 11.4; Doc. 14-5 at 17.)  If special circumstances apply, the

Plan Administrator may take up to an additional 90 days to issue the denial, as

long as the claimant has notice of the 90-day extension.  (Doc 14-4 at 92–93, § 11.4;

Doc. 14-5 at 17.)  The Plan Administrator's denial is subject to administrative

review, in order to afford the claimant an opportunity for a full and fair review.

(Doc 14-4 at 92–93, § 11.4; Doc. 14-5 at 17–18.)  After a denial, the claimant has

60 days to appeal the decision in writing to the HR Administrative Committee.

(Doc 14-4 at 93; Doc. 14-5 at 17–18.)  If the HR Administrative Committee affirms

the denial, the claimant may then bring a civil action under § 502(a)—ERISA's civil

enforcement section.  (Doc. 14-5 at 18; *see also* 29 U.S.C. § 1132.)  The claimant

must exhaust this administrative review process prior to bringing any civil action.

(Doc. 14-5 at 18.)

### B.  Cooper's Efforts to Obtain Benefits

On July 10, 2014, Cooper contacted PUB to inquire about her benefits under

both the Chittenden Pension Plan and the Vermont National Plan.  (Doc. 26 at 3;

Doc. 26-1 at 3, ¶¶ 9, 10.)  Cooper spoke to a "retirement specialist" who confirmed

her eligibility for benefits under the Vermont National Plan.  (Doc. 26-1 at 3, ¶¶ 9,

10; Doc. 14-7 at 2.)  The specialist told Cooper that records concerning her

participation in the Chittenden Pension Plan could not be located.  (Doc. 26-1 at 3,

¶ 10.)

Subsequently, on August 12, 2014, PUB sent Cooper a notice of benefits

containing her accrued-benefits calculation and attaching a form prepared by PUB,

titled "Application for Chittenden Pension Account Plan Benefit." (*See generally* Doc. 35, Def.'s Ex. C.) PUB's benefits calculation indicated that Cooper's "Original Date of Hire" was May 13, 1985, the date that Cooper began working at Vermont National Bank.[5] (*Id.*, Def.'s Ex. C at 2.) The benefits calculation did not show that Cooper had been employed at Chittenden Bank, nor did it indicate that she had accrued benefits as a result of her employment there. (*Id.*)

On August 27, 2014, Cooper submitted her "Application for Chittenden Pension Account Plan Benefit," indicating in the form that she elected to receive her benefits as a single life annuity. (*Id.*, Def.'s Ex. D.) That form application also contains the following language: "I make application for payment of my retirement benefit to which I am entitled to under the Chittenden Pension Account Plan." (*Id.* at 6.) On October 1, 2014, PUB began distributing the benefits accrued during Cooper's employment at Vermont National Bank, but PUB did not distribute any benefits related to Cooper's work at Chittenden Bank. (Doc. 26-3 at 1, ¶ 7; Doc. 14-6 at 1.)

During approximately the same time, Cooper continued to ask PUB for the benefits records from her employment with Chittenden Bank. (Doc. 26-1 at 2, ¶ 12.) According to her sworn affidavit, PUB representatives informed Cooper that, because "their records from that period were spotty," it was possible that Cooper's Chittenden Bank pension funds might have been transferred to John Hancock, a

---

[5] This date of hire corresponds with a Personalized Benefit Statement that was mailed to Cooper in December 2011. (Doc. 35, Def.'s Ex. B at 3.) Like Cooper's benefits calculation, the Personalized Benefit Statement contained no mention of Cooper's employment with Chittenden Bank. (*See generally id.*)

financial services company, or distributed to Cooper. (*Id.*) At some point, Kyle Gibb, one of PUB's employee benefits specialists, informed Cooper that several former Chittenden Bank employees faced similar problems with missing retirement information. (*Id.* ¶ 14.) Then, after searching for several months, on November 21, 2014, Gibb told Cooper in an e-mail that he had "exhausted all . . . research avenues" and that he could proceed no further with her claim until she provided documentation "showing a pension benefit is due to you for the pre-1985 time frame." (*Id.* ¶ 15; *id.* at 6–7.) Cooper believed this e-mail was PUB's final decision denying her Chittenden Bank pension funds. (*Id.* at 2, ¶ 16.)

Despite this belief, Cooper continued to contact PUB regarding the Chittenden Bank pension. (*Id.* at 2–3, ¶¶ 17–20.) Eventually, in April 2015, Peter Saxton, an employee benefits program manager for PUB, emailed Cooper to advise that he was reviewing her claim. (*Id.* at 3, ¶¶ 21–22; *id.* at 6.) After Saxton's review, Cooper was again informed that PUB had no record of Cooper's employment with Chittenden Bank nor of Cooper's participation in the Chittenden Pension Plan, and that the funds had likely been distributed to Cooper or used to purchase an annuity with John Hancock. (*Id.* at 3, ¶ 23.)

Approximately five months later, on September 9, 2015, Cooper mailed a letter to the Internal Revenue Service (the IRS letter), along with a courtesy copy to PUB, seeking records related to her employment with Chittenden Bank and requesting an investigation into PUB's handling of her claimed pension funds. (*Id.* ¶ 25; Doc. 14-3.) On November 17, 2015, Nancy Stracuzzi, an employee benefits

vice president for PUB, acknowledged receipt of the IRS letter as of September 24, 2015, and informed Cooper that PUB was treating it as a formal claim for benefits under the Chittenden Pension Plan's procedures. (*See generally* Doc. 14-6.)

Following the claims procedure described above, Nancy Stracuzzi informed Cooper that a claims officer would provide a written notice either approving or denying Cooper's request for benefits within 180 days of September 24, 2015—the date PUB purportedly received the IRS letter.[6] (*Id.*) Stracuzzi also provided Cooper with a copy of the Chittenden Pension Plan's claims procedures. (*Id.*) Finally, Stracuzzi requested additional information from Cooper, including her credit history verifying her dates of employment with Chittenden Bank, her Social Security employment history, any correspondence relating to the Chittenden Pension Plan, and any Chittenden Pension Plan benefit statements or pension-benefit calculations. (*Id.*)

### C. Denial of Claim

On March 16, 2016, Stracuzzi, acting in her capacity as a claims officer, informed Cooper of PUB's denial of her claim for benefits accrued during her employment at Chittenden Bank. (Doc. 14-7 at 1.) Stracuzzi advised that, although records confirmed that Chittenden Bank employed Cooper from 1972 through 1985, "none of the records or information shows that you are entitled to a Chittenden Plan

---

[6] As explained above, generally under the Chittenden Pension Plan, a claims officer is required to notify the claimant within 90 days after the claim is received, unless the claim is a special case that requires an additional 90 days to make a determination. (Doc. 14-4 at 92–93, § 11.4; Doc. 14-5 at 18.) In her November 17, 2015 letter, Stracuzzi informed Cooper that PUB needed the additional 90 days to resolve Cooper's claim. (Doc. 14-6 at 1.)

benefit." (*Id.* at 2.) Stracuzzi suggested three possible explanations for the lack of records: first, it was "very likely" that Chittenden Bank paid Cooper her accrued benefits in a single lump sum payment after her termination and no record of this payment was kept; second, it was "possible" that an annuity was purchased from Manufacturer's Life Insurance Company in either 1986, 1988, or 1991, and that this annuity was now payable through John Hancock; and third, it was conceivable that Cooper did not accumulate the necessary service hours at Chittenden Bank to be fully vested in the Chittenden Pension Plan. (*Id.*) Moreover, Stracuzzi noted that, because the Chittenden Pension Plan records "clearly reflect[ed]" the pension benefits Cooper accrued under the Vermont National Plan, "it seem[ed] unlikely that those records would not also include any Chittenden [Pension] Plan benefit that was still due to [Plaintiff] based on [her] service with Chittenden [Bank]." (*Id.* at 3.)

This March 2016 denial of benefits concluded by setting forth Cooper's right to file an administrative appeal to PUB's HR Administrative Committee. (*Id.* at 4–5.) As described above, the Chittenden Pension Plan's procedures required that Cooper appeal the adverse benefits determination to the HR Administrative Committee within 60 days. (Doc. 14-4 at 92–93, § 11.4; Doc. 14-5 at 17.) Finally, Stracuzzi advised Cooper that, in the event the HR Administrative Committee denied the claim, Cooper could commence a civil action under § 502(a) of ERISA. (Doc. 14-7 at 5; Doc. 14-4 at 93, § 11.4; Doc. 14-5 at 18; *see also* 29 U.S.C. § 1132.)

Cooper never appealed the March 2016 denial of her claim for benefits to the HR Administrative Committee.  (Doc. 14 at 4.)

## Procedural Background

On May 1, 2017, Cooper filed the present civil enforcement action under 29 U.S.C. § 1132, claiming that PUB failed to "safeguard and disburse" her pension enefits as required by ERISA,[7] breached a duty to hold her pension in trust for her benefit, and neglected its obligations as bailee of her pension.  (Doc. 1 at 2–3, ¶¶ 10, 11, 18, 21.)  For relief, Cooper asks the Court to determine the value of her Chittenden Bank benefits and to award those benefits to her, along with penalties and interest.  (*Id.* at 3, ¶ 21.)

In response, PUB filed the pending Motion for Summary Judgment, asserting that Cooper failed to exhaust her administrative remedies under ERISA and that Cooper's common law claims are preempted by ERISA.  (Doc. 14.)  Cooper opposes the Motion, arguing that her administrative remedies should be deemed exhausted because PUB failed to follow the Chittenden Pension Plan's procedures both after Cooper applied for benefits on August 28, 2014 (Doc. 37 at 1; Doc. 26 at 5), and after PUB treated Cooper's IRS letter as a request for benefits.  (Doc. 37 at 3; Doc. 26 at 5.)  In the alternative, Cooper argues that any further administrative appeal would have been futile, given that her extended efforts to gain information from

---

[7] Although unclear from the Complaint's language, given that Cooper seeks the value of her Chittenden Bank benefits (Doc. 1 at 3, ¶ 21), the Court construes Cooper's "safeguard and disburse" claim as a request for benefits under § 1132(a)(1), not as an allegation that PUB violated its fiduciary duty to act in the best interest of plan participants.  *Cf.* 29 U.S.C. § 1104(a).  This conclusion is supported by the admission made by Cooper's counsel at the summary judgment hearing that Cooper "is seeking the benefits."  *See* Hearing Argument at 10:09, *Cooper v. Peoples United Bank, N.A.*, No. 2:17–CV–76 (Dec. 1, 2017) (Conroy, Mag. J.).

PUB proved fruitless and that she could not provide any additional information to support her claim. (Doc. 26 at 4.) Finally, Cooper asserts that her state law claims are not preempted because, "[a]t this stage of discovery," the scant record suggests that PUB's purported misuse of the funds could fall under several state law causes of action. (*Id.* at 6–7.)

The Court held a hearing on PUB's Motion for Summary Judgment on December 1, 2017,[8] and thereafter requested further briefing from the parties.[9] (Doc. 34.) In her supplemental memorandum, Cooper again asserts that PUB did not adhere to its claims procedures and that, as a result, her administrative remedies should be deemed exhausted. (Doc. 37 at 1–5.) PUB argues in response that, on August 12, 2014, when Cooper received a benefit calculation that did not reflect her Chittenden Bank employment, she was required to dispute that calculation within 60 days or forfeit the opportunity to receive the Chittenden Bank benefits. (Doc. 38 at 3.) PUB further asserts that, even if PUB failed to follow the Plan's procedures, Cooper was not prejudiced by this failure because PUB ultimately undertook a full and complete benefits review. (*Id.* at 6–7.)

---

[8] As noted above, at the summary judgment hearing, PUB offered several new pieces of evidence in support of its Motion for Summary Judgment, which were admitted after Cooper's counsel made no objection. *See* Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2721.

[9] Specifically, in a Text Order, the Court asked the parties to consider this question: "In the event that administrative remedies in connection with a claim for benefits are deemed exhausted because the plan administrator may have failed to follow the plan's procedures, does a plan administrator's subsequent decision to reopen and review the claim cure the plan administrator's prior failure?" (Doc. 36.)

**Analysis**

## I.  Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases omitted). The core inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251–52.

The party moving for summary judgment bears the burden of showing that no genuine issue of material fact exists.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  As such, a court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247–50).  The nonmoving party may defeat the summary judgment motion by making a showing sufficient to establish that there is a genuine issue of material fact for trial.  *Celotex Corp.*, 477 U.S. at 322.  Permissible support for this showing includes "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

14

admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see also Anderson*, 477 U.S. at 248. A fact is material if it "affect[s] the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

If the nonmoving party does not establish a genuine dispute of material fact and if the only issues to be decided in the case are issues of law, a court may grant summary judgment. Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2725. Although difficult legal questions or the novel application of a legal principle may weigh against summary judgment, such difficulties are generally not sufficient on their own to delay adjudication of a dispute. *Id.*; *Sec. & Exch. Comm'n v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978) ("Summary judgment, however, is not necessarily precluded merely because the legal issue is complex."). Ultimately, summary judgment is appropriate if the parties merely dispute the significance of events but do not dispute which events actually occurred. *Transamerica Delaval Inc. v. Citibank, N.A.*, 545 F. Supp. 200, 203 (S.D.N.Y. 1982); *see also* Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2725.

## II.     Count One–ERISA Claim

In opposing PUB's Motion for Summary Judgment, Cooper does not claim that she exhausted her administrative remedies prior to bringing her suit under ERISA. Instead, she contends that, despite her failure to appeal from the 2016 denial of her benefits to the HR Administrative Committee, summary judgment is not warranted because of two exceptions to the rule requiring administrative exhaustion. (*See generally* Docs. 26, 37.) First, Cooper argues that she did not need

to exhaust her administrative remedies because those remedies were deemed exhausted by PUB's failure to comply with minimal regulatory requirements in processing her claim. (Doc. 26 at 3; Doc. 37 at 2–3.) Second, Cooper argues that, given her extensive communication with PUB, any further administrative appeal would have been futile. (Doc. 26 at 4–5; Doc. 37 at 3–5.) Concluding that neither exception applies and that there is no genuine dispute of material fact, the Court GRANTS PUB's Motion for Summary Judgment as to Count One, as explained below.

## A.    Administrative Exhaustion

As a general rule, a claimant must exhaust his or her administrative remedies prior to commencing a civil action for benefits under § 502(a)(1)(B) of ERISA.[10]  *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir.

---

[10] As a threshold standing issue, Cooper is also required to show that she was a participant in the Chittenden Pension Plan.  PUB appears to concede this point, stating in its Statement of Undisputed Materials Facts that Plaintiff "was eligible for pension benefits under the [Chittenden Pension Plan] subject to the satisfaction of certain conditions."  (Doc. 14-2 at 1, ¶ 3.)

In any case, a reasonable inference may be drawn that Cooper was a participant in the Chittenden Pension Plan.  To establish that she was a participant: "(1) [Cooper] must [have been] an employee; and (2) according to the language of the subject ERISA-covered plan, [she] must [have been] eligible to receive a benefit under the plan."  *McLellan v. E.I. DuPont de Nemours & Co.*, No. 04-CV-314, 2006 WL 3751583, at *16 (W.D.N.Y. Dec. 19, 2006) (citing *Bauer v. Summit Bancorp.*, 325 F.3d 155, 160 (3d Cir. 2003)).  There is no dispute that Cooper was a common law employee of Chittenden Bank.  *Bauer*, 325 F.3d at 160.  Both parties acknowledge that Cooper worked for Chittenden Bank from 1972 through 1985.  (Doc. 14-7 at 3; Doc. 26-1 at 11.)  And, under the second prong, the record before the Court supports the reasonable inference that Cooper has demonstrated "a colorable claim to vested benefits" under the Chittenden Pension Plan.  *McLellan*, 2006 WL 3751583, at *16 (plaintiff had a colorable claim for benefits where it was "highly likely" he was "eligible to receive a benefit under the plan").  As indicated by the Social Security Administration's earning records, Cooper was employed by Chittenden Bank for over ten years.  (Doc. 14 at 2; Doc. 26-3 at 1, ¶ 1; Doc. 26-1 at 11.)  To be fully vested, an employee merely needed to work 20 hours per workweek for five calendar years.  (Doc. 14-4 at 27, 29, §§ 2.2(a), 2.3(a); Doc. 14-5 at 3.)  Thus, Cooper likely completed the five years of "eligibility service" required under the Chittenden Pension Plan.  (Doc. 26-3 at 1, ¶ 2; Doc. 14-4 at 65, § 7.2(a)(ii).)

1993) ("This Court has recognized 'the firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases.'" (quoting *Alfarone v. Bernie Wolff Constr. Corp.*, 788 F.2d 76, 79 (2d Cir. 1986))); *see also* 29 U.S.C. §§ 1132(a)(1)(B), 1133(2). The exhaustion requirement is judicially imposed and serves three important policy functions: (1) it fulfills Congress's intent that the employer, rather than the federal court, should be responsible for its own actions; (2) it provides a clear record of the employer's administrative actions for possible use in any subsequent litigation; and (3) it ensures that the employer's actions are reviewed by the courts under the arbitrary and capricious standard, not de novo. *Kennedy*, 989 F.2d at 594; *see also Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 55 (2d Cir. 2016). As a whole, the doctrinal policy encourages administrative review by the plan administrator because, "[w]hen a plan participant claims that he or she has unjustly been denied benefits, it is appropriate to require participants first to address their complaints to the fiduciaries to whom Congress . . . assigned the primary responsibility for evaluating claims for benefits." *Zipf v. Am. Tel. & Tel. Co.*, 799 F.2d 889, 892 (3d Cir. 1986). Further, because this policy has little to do with the presence of a case or controversy, "a failure to exhaust ERISA administrative remedies is not jurisdictional, but is an affirmative defense." *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 446 (2d Cir. 2006).

As noted above, two exceptions to the administrative exhaustion requirement are at issue here. First, 29 C.F.R. § 2560.503-1 sets forth the minimum

requirements for employee benefit plan procedures pertaining to claims by plan participants. Pursuant to this regulation, a claimant need not exhaust his or her administrative remedies if the court deems those remedies exhausted by the plan administrator's failure to "follow claims procedures consistent with the requirements of [the regulation]." *Id.* § 2560.503-1(l)(1). Second, the claimant may be excused from pursuing a plan's internal administrative remedies if the court concludes that further administrative review would be futile. *Davenport v. Harry N. Abrams, Inc.*, 249 F.3d 130, 133 (2d Cir. 2001) (per curiam). The applicability of each exception is examined below.

### B. Administrative Remedies Deemed Exhausted

Cooper argues that her administrative remedies should be deemed exhausted because PUB twice failed to comply with the minimal regulatory requirements set forth in 29 C.F.R. § 2560.503-1: first, while processing Cooper's initial application for benefits (Doc. 26 at 3; Doc. 37 at 2–3); and second, while treating Cooper's IRS letter as a formal claim for benefits. (Doc. 26 at 4–5; Doc. 37 at 3–5.) As discussed below, the Court concludes that neither instance supports application of the deemed-exhausted exception.

### 1. Cooper's Initial Application for Benefits

First, concluding that Cooper was not prejudiced and could still access a reasonable claims procedure, the Court finds that any failure by PUB to comply with 29 C.F.R. § 2560.503-1 during the initial application process should not result in Cooper's administrative remedies being deemed exhausted.

Under 29 C.F.R. § 2560.503-1, if a plan provider does not comply with certain regulatory requirements, a claimant's administrative remedies may be deemed exhausted and the claimant may pursue "any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits." *Id.* § 2560.503-1(l)(1); *see Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 221 (2d Cir. 2006). For example, 29 C.F.R. § 2560.503-1 requires a plan administrator to notify a claimant of an adverse benefits determination within 90 days of the claim, unless special circumstances justify an additional 90 days. *Id.* § 2560.503-1(f)(1). Further, this adverse benefits notification must include detailed information, including "[t]he specific . . . reasons for the adverse determination," "[r]eference to the specific plan provisions on which the determination is based," and "[a] description of any additional material or information necessary for the claimant to perfect the claim." *Id.* § 2560.503-1(g)(1)(i)–(iii). A claimant's administrative remedies may be deemed exhausted even if a plan administrator substantially complies with these regulatory requirements, *Eastman Kodak Co.*, 452 F.3d at 223; however, a court may tolerate "inadvertent and harmless deviations in the processing of a particular claim, so long as the plan otherwise establishes procedures in full conformity with the regulation."[11] *Halo*, 819 F.3d at 57.

---

[11] Although a particular claim will not be deemed exhausted if a plan administrator merely deviates from the requirements of 29 C.F.R. § 2560.503-1, such a deviation will cause a plan administrator to lose the deferential standard of review when a claimant files suit in federal court. *See Halo*, 819 F.3d at 56–57.

Several cases further define this demarcation between a plan's "inadvertent and harmless deviation" on the one hand, and, on the other hand, a plan's failure to follow the regulatory requirements of 29 C.F.R. § 2560.503-1, which gives rise to the deemed-exhausted provision. For example, in *Halo*, the Second Circuit quoted this advice from the Department of Labor:

> A plan that establishes procedures in full conformity with the regulation might, in processing a particular claim, inadvertently deviate from its procedures. If the plan's procedures provide an opportunity to effectively remedy the inadvertent deviation without prejudice to the claimant, through the internal appeal process or otherwise, then there ordinarily will not have been a failure to establish or follow reasonable procedures as contemplated by § 2560.503-1(l).

819 F.3d at 57 (quoting Dep't of Labor, Benefit Claims Procedure Regulation FAQs, F-2, https://www.dol. gov/agencies/ebsa/ about-ebsa/our-activities/resource-center/faqs/benefit-claims-procedure-regulation). Following this guidance, the Second Circuit stated that a plan administrator's failure to comply with the regulatory deadlines by several days or several hours was unlikely to render a claimant's administrative remedies deemed exhausted. *Id.* Similarly, in *Wilson v. Aetna Life Insurance Company*, the Northern District of New York applied *Halo* and concluded that, although the plan's denial was untimely under 29 C.F.R. § 2560.503-1, the claimant waived her ability to take advantage of the deemed-exhausted provision by waiting for the plan administrator to render its adverse benefits decision. *Wilson*, No. 8:15-CV-752 (MAD/CFH), 2016 WL 5717370, at *9 (N.D.N.Y. Sept. 30, 2016) ("Having opted to forego taking advantage of [the deemed-exhausted] provision by bringing her claim prior to receiving the adverse decision,

Plaintiff cannot now argue that Aetna is stripped of its deferential review simply because she does not agree with the decision it rendered.").  By contrast, the Second Circuit has also determined that, if the plan administrator adopts ERISA-compliant procedures *after* a plaintiff brings suit, the plan cannot retroactively use the new procedures "to effectively 'undeem' exhaustion." *Eastman Kodak Co.*, 452 F.3d at 222.  In sum, several factors determine whether a plan administrator's noncompliance with 29 C.F.R. § 2560.503-1 gives rise to the deemed-exhausted provision: whether the plan adopted procedures fully conforming with the regulation prior to the present litigation; whether the plan administrator's nonconformance was inadvertent; and, most importantly, whether the plan's procedures provided an opportunity for the claimant to remedy the deviation without prejudice by accessing "a reasonable claims procedure that would yield a decision on the merits of the claim." *Id.*; § 2560.503-1(l).

Here, the claims procedures set forth in the Chittenden Pension Plan generally conform to the regulatory requirements of 29 C.F.R. § 2560.503-1. *Compare* 29 C.F.R. § 2560.503-1, *with* Doc. 14-5 at 17–18.  And these procedures were in place before Cooper filed this lawsuit.  *Cf. Eastman Kodak Co.*, 452 F.3d at 222.  Any deviation by PUB in addressing Cooper's claim did not implicate the overall integrity of the Chittenden Pension Plan; instead the nonconformance involved only Cooper's particular claim.  *Halo*, 819 F.3d at 57.

Second, any deviation by PUB from the Chittenden Pension Plan procedures was, at most, based on an inadvertent interpretation of the Plan procedures.

Cooper argues that, by its plain language,[12] the form application she submitted on August 28, 2014, encompassed the benefits for Cooper's employment at Chittenden Bank and that, because PUB failed to adhere to minimal regulatory requirements in responding to this claim,[13] Cooper's remedies should be deemed exhausted. (Doc. 37 at 2.) But along with the form application that Cooper submitted (Doc. 26 at 3; Doc. 26-1 at 3, ¶¶ 9, 10), PUB sent Cooper an accrued-benefits calculation that accounted for Cooper's employment only at Vermont National Bank. (*See generally* Doc. 35, Def.'s Exs. C, D.) In mailing this calculation, PUB followed the claims procedure requiring the Plan Administrator to provide "an Explanation of the Chittenden Pension Account Plan Benefit Payments . . . at least 30 days and no more than 180 days before benefit payments begin." (Doc. 14-5 at 14; *see also* Doc. 38 at 2.) Given that this accrued-benefits calculation did not include benefits from Cooper's employment with Chittenden Bank (Doc. 14-4 at 94–95, § 11.6), PUB could reasonably interpret the Plan procedures as requiring Cooper to dispute the accrued-benefits calculation in writing or electronically within 60 days.[14] (Doc. 14-5

---

[12] The specific language in the form application supporting Cooper's contention is as follows: "I make application for payment of my retirement benefit to which I am entitled to under the Chittenden Pension Account Plan." (Doc. 35, Def.'s Ex. D, at 6.) Cooper's argument is that, because the Vermont National Plan merged into the Chittenden Pension Plan (Doc. 14-4 at 25–26, § 2.1(e)), this language encompassed the benefits for Cooper's employment at both banks. (Doc. 37 at 1–2.)

[13] It is clear that the email sent by PUB's representative on November 21, 2014 did not comply with these requirements—for example, it did not include information referencing "the specific plan provisions on which the determination is based," as required by 29 C.F.R. § 2560.503-1(g)(1)(ii). (Doc. 37 at 2.)

[14] The record does not show that Cooper disputed the accrued-benefits calculation in writing, although an inference may be drawn from the record that Cooper disputed the benefits calculation over the phone and that PUB was on notice that Cooper believed she was entitled to benefits for her employment at Chittenden Bank. (*See* Doc. 26-1 at 2, ¶¶ 12–15.)

at 17.)  Indeed, such an interpretation falls within PUB's broad discretionary authority to construe the Plan's terms.  (Doc. 14-4 at 94–95, § 11.6.)  Given this broad discretion, any failure by PUB to treat the language in Cooper's form application as a claim for Chittenden Bank benefits was, at most, an inadvertent deviation based on PUB's construction of the other claims procedures at issue.

Finally, and most importantly, Cooper was not harmed by any deviation because PUB ultimately provided Cooper with renewed opportunity to receive a decision on the merits of her claim through the internal appeals process.  (Doc. 14-5 at 17–18); § 2560.503-1(l).  Following PUB's November 21, 2014 email, Cooper continued to contact PUB regarding the Chittenden Bank pension (Doc. 26-1 at 2–3, ¶¶ 17–20), and Cooper was again informed that PUB had no record of Cooper's participation in the Chittenden Pension Plan.  (*Id.* at 3, ¶ 23.)  Approximately six months after this correspondence, on September 9, 2015, Cooper sent the IRS letter, mailing a copy to PUB.  (*Id.* ¶ 26; *see generally* Doc. 14-3.)  In response, on November 17, 2015, Stracuzzi acknowledged delivery of the letter and exercised her discretion to treat it anew as a formal claim for benefits under the Plan's procedures.  (Doc. 14-6.)

The subsequent review process initiated by Stracuzzi fully conformed with 29 C.F.R. § 2560.503-1.  First, Stracuzzi informed Cooper that she would receive written notice either approving or denying her request for benefits within 180 days of September 24, 2015, the date Stracuzzi claimed that PUB received the IRS letter.  (*Id.*)  Then, on March 16, 2016—approximately 170 days later—Stracuzzi denied

Cooper's request for her Chittenden Bank benefits, correctly setting forth the reasons for the denial, the relevant sections of the Plan, and Cooper's right to file an administrative appeal to PUB's HR Administrative Committee within 60 days. (Doc. 14-7 at 1–4); *see also* 29 C.F.R. § 2560.503-1. Thus, despite any prior noncompliance by PUB, Cooper had a full opportunity to have her claim reviewed through the internal appeals process, yet she failed to seek administrative review.

Further, the record does not establish that the delay prejudiced Cooper. This is not a circumstance where a claimant brought suit in district court and, in response, the plan administrator attempted to retroactively enact new procedures that complied with 29 C.F.R. § 2560.503-1. *Cf. Eastman Kodak Co.*, 452 F.3d at 222 ("[N]othing in the claims regulation permitted [the plan administrator] to effectively 'undeem' exhaustion by enacting, for the first time, procedures that complied with the claims regulation after [the claimant] filed suit." (internal quotation marks omitted)); *England v. Marriott Int'l, Inc.*, 764 F. Supp. 2d 761, 774 (D. Md. 2011) (concluding "Plaintiffs' administrative remedies are 'deemed exhausted' because Defendants' administrative procedure for bringing ERISA claims and appealing denials of ERISA benefits was only implemented after this litigation commenced."). Here, the Chittenden Pension Plan procedures were already in place and conformed with § 2560.503-1. Further, rather than pursuing litigation after PUB's initial denial of her benefits, Cooper effectively waived her ability to immediately file suit under 29 C.F.R. § 2560.503-1(1) by continuing to informally contact PUB. *See Wilson*, 2016 WL 5717370, at *9 (finding plaintiff "waived her ability to take

advantage of 29 C.F.R. § 2560.503-1(1)" by failing to bring the action upon expiration of the initial 90-day time limit and by waiting until the plan administrator made an adverse benefits determination). Having opted to forgo litigation until Stracuzzi rendered a formal adverse benefits decision, Cooper cannot now argue that she was prejudiced by any purported deviation from 29 C.F.R. § 2560.503-1. *Id.* Indeed, by failing to appeal Stracuzzi's decision to the HR Administrative Committee, Cooper squandered a crucial opportunity to have her claim reviewed on the merits. (*See* Doc. 14-5 at 17.)

Based on the foregoing, the Court concludes that Cooper's administrative remedies cannot be deemed exhausted.

## 2. Application for Benefits Based on IRS Letter

There is no dispute that, on November 17, 2015, Stracuzzi, acting in the capacity of the Plan Administrator, elected to re-examine Cooper's claim by treating Cooper's written inquiry to the IRS as a formal claim for benefits. As explained below, the Court next concludes that, in treating Cooper's IRS Letter as a benefits claim, PUB complied with 29 C.F.R. § 2560.503-1 and, in any case, any purported failure to conform with the regulation neither prejudiced Cooper nor prevented her from having an opportunity for a full administrative review, which she did not avail herself of.

As described above, under 29 C.F.R. § 2560.503-1, a plan administrator must notify a claimant of an adverse benefits determination within 90 days of the plan's receipt of the claim, unless special circumstances justify an additional 90 days. *Id.*

§ 2560.503-1(f)(1).  In this case, as noted above, Stracuzzi informed Cooper that an additional 90 days would be required to process the IRS Letter as a benefits claim, which gave Stracuzzi 180 days to respond to the letter.  (Doc. 14-6 at 1.)  According to Stracuzzi, she received the IRS letter on September 24, 2015 (*id.*); thus, PUB was required to provide Cooper with a benefits notification no later than March 22, 2016.  (*Id.*)  Neither party disputes that Cooper did, in fact, receive an adverse benefits determination prior to this date, on March 16, 2016.  (*See* Doc. 14-7.)

Cooper asserts, however, that PUB received the IRS letter earlier than September 24, 2015.  Specifically, Cooper argues that it can be presumed based on either reasonable mailing time or the common law mailbox rule that PUB received the letter approximately three days after it was mailed on September 9, that is, on September 12, 2015.  (Doc. 26 at 4–5; Doc. 37 at 3–5.)  Counting 180 days from September 12, Cooper argues that PUB was required to render a final decision by March 10, 2016.  (*Id.*)  Because Stracuzzi did not notify Cooper of her adverse benefits determination until March 16, 2016, Cooper claims that her administrative remedies should be deemed exhausted under 29 C.F.R. § 2560.503-1(l).  (Doc. 37 at 4.)

But Cooper offers no evidence beyond conjecture to show that PUB received the IRS letter prior to September 24, 2015.  Although Cooper's invocation of the "mailbox rule" raises "a presumption that [the IRS letter] reached its destination in usual time and was actually received by the person to whom it was addressed," the mailbox rule does not establish the specific delivery date of the letter.  *Zirogiannis*

*v. Nat'l Recovery Agency, Inc.*, Civil Action No. 14-3954, 2015 WL 8665448, at *6 (E.D.N.Y. Dec. 11, 2015). Instead, "[the mailbox rule] is a tool for determining, in the face of inconclusive evidence, whether or not receipt has actually been accomplished." *Schikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956, 961 (9th Cir. 2001). Here, the evidence regarding receipt of the IRS letter is conclusive: PUB and Stracuzzi received the letter. (*See generally* Doc. 14-6.) The dispute involves the date of receipt, and Cooper offers no evidence beyond her conjecture on that issue.

More importantly, even if Cooper is correct regarding the date of receipt, such a failure to conform with 29 C.F.R. § 2560.503-1(f) neither prejudiced Cooper nor prevented her from having an opportunity for administrative review. At most, PUB's adverse benefits determination was six days late. It is unlikely that such a short delay harmed Cooper and, indeed, Cooper presents no evidence that she was prejudiced by this purported brief deviation from requirements of 29 C.F.R. § 2560.503-1(f). Further, as described above, Stracuzzi's adverse benefits determination provided Cooper with the immediate opportunity to have her claim reviewed on the merits by the HR Administrative Committee. (*See* Doc. 14-7 at 3; Doc. 14-5 at 17–18.) Yet Cooper failed to do so and waited more than a year to bring this case. She cannot now argue that her administrative remedies should be deemed exhausted as a result of PUB's alleged failure to comply with 29 C.F.R. § 2560.503-1. *Wilson*, 2016 WL 5717370, at *9. Quite simply, Cooper had a full opportunity to pursue administrative remedies and elected to not do so.

## C.    Futility of Exhausting Administrative Remedies

As an alternative to the deemed-exhausted provision, Cooper argues that PUB's Motion for Summary Judgment should not be granted because her pursuit of further administrative appeal would have been futile.  But the Court concludes that Cooper has failed to make a clear and positive showing of futility.

The claimant may be excused from pursuing a plan's internal administrative remedies if the court concludes that further administrative review would be futile. *Davenport*, 249 F.3d at 133.  A claimant seeking to demonstrate futility must make "a clear and positive showing." *Id.* (emphasis and internal quotation marks omitted); *see also Kennedy*, 989 F.2d at 594 ("Where claimants make a 'clear and positive showing' that pursuing available administrative remedies would be futile, the purposes behind the requirement of exhaustion are no longer served, and thus a court will release the claimant from the requirement.").  Neither a period of informal communication with the plan administrator, nor ignorance of the plan's procedures necessarily establishes futility. *Davenport*, 249 F.3d at 133–34 (alteration in original) (quoting *Bourgeois v. Pension Plan for Emp. of Santa Fe Int'l Corps.*, 215 F.3d 475, 480 n.14 (5th Cir. 2000) ("[A]llowing informal attempts to substitute for the formal claims procedure would frustrate the primary purposes of the exhaustion requirement.")).  The high burden of proof necessary to prove futility advances the primary purpose of the exhaustion requirement: to fulfill Congress's intent that plan administrators, rather than the federal courts, be responsible for determining whether a claimant qualifies for benefits. *Kennedy*, 989 F.2d at 594.

Cooper does not meet the high standard necessary to demonstrate futility because Stracuzzi's adverse benefits determination on March 16, 2016 "did not render futile further pursuit of her claims through the proper channels." *Davenport*, 249 F.3d at 133. Instead, the adverse benefits determination set forth the proper methods for Cooper to administratively appeal Stracuzzi's decision. (*See* Doc. 14-7 at 3; Doc. 14-5 at 17.) Although PUB's communications arguably evinced an intent to deny Cooper's claim on appeal, the Court cannot predict how the HR Administrative Committee would have decided the claim. *Davenport*, 249 F.3d at 134 (citing *Wilson v. Globe Specialty Prods.*, 117 F. Supp. 2d 92, 99 (D. Mass. 2000)). Allowing Cooper to forgo administrative appeal under these circumstances would permit her to substitute her informal communications for PUB's formal claims procedure, undermining the primary purpose of the exhaustion requirement. *Cf. id.* at 133–34 (citing *Bourgeois*, 215 F.3d at 480 n.14). That is, the Court would be primarily responsible for deciding Cooper's claim for benefits, rather than PUB. *See Barnett v. Int'l Bus. Machines Corp.*, 885 F. Supp. 581, 588 (S.D.N.Y. 1995).

Moreover, absent further development of the record on administrative appeal, "there is not a sufficiently clear record of administrative action to support effective judicial review" by this Court. *Id.*; *see also Kennedy*, 989 F.2d at 594. In particular, the majority of the record for review consists of informal correspondence between Cooper and PUB. Aside from Stracuzzi's letter and Cooper's initial claim for benefits, there is scant evidence of PUB's administrative actions on which this Court could base its review. *Barnett*, 885 F. Supp. at 588. Under these

circumstances, Cooper cannot bypass the administrative appeals process and file suit, hoping for the Court to justify her actions on the basis of futility. *Davenport*, 249 F.3d at 134 (citing *Commc'ns Workers of Am. v. AT&T*, 40 F.3d 426, 433 n.1 (D.C. Cir. 1994)).

Because Cooper has not made a clear and positive showing of futility to excuse her failure to exhaust her administrative remedies, summary judgment must be granted.

### D.    Material Facts Not in Dispute

Finally, the Court concludes that material facts are not in dispute: PUB and Cooper do not disagree about the general order of events, but merely dispute their legal significance. (*Compare generally* Doc. 26 *with* Doc. 28.) As discussed in detail above, Cooper opposes summary judgment by asserting that, based on the facts, either her administrative remedies should be deemed exhausted or her failure to exhaust her administrative remedies should be excused as futile (Doc. 37 at 1; Doc. 26 at 4); by contrast, PUB argues that the Court should draw the opposite legal conclusion from the same operative facts. (Doc. 38 at 6, Doc. 28 at 1.) At most, PUB and Cooper disagree about the date that the IRS Letter was received by PUB and Stracuzzi (*compare* Doc. 26 at 8, *with* Doc. 38 at 5); however, as concluded above, this date carries little legal significance because it does not affect whether Cooper's remedies were deemed exhausted. Given that Cooper and PUB merely dispute the legal significance of the events, summary judgment is particularly appropriate.

*Transamerica Delaval Inc.*, 545 F. Supp. at 203; *see also* Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2725.

In sum, concluding that Cooper's remedies were not deemed exhausted, that further administrative appeal would not have been futile, and that no material facts are in dispute, PUB's Motion for Summary Judgment is GRANTED as to Count One of Cooper's Complaint.

## III.   ERISA and Preemption of Plaintiff's Common Law Claims

PUB also seeks summary judgment on the common law constructive trust[15] and bailment[16] claims alleged in Counts Two and Three of the Complaint, contending that these claims are preempted by ERISA.  The Court agrees, finding that these claims plainly relate to Cooper's employee benefits plan and are supplanted by § 502(a)—ERISA's civil enforcement remedy.  *See also* 29 U.S.C. § 1144(a) (setting forth preemption standard).

Whether ERISA preempts a state common law cause of action is a question of law.  *Devlin v. Transp. Commc'ns Int'l Union*, 173 F.3d 94, 98 (2d Cir. 1999). Preemption analysis begins with the presumption that Congress does not intend to

---

[15] Under Vermont law, "It is a familiar principle of equity that a trust is implied whenever the circumstances are such, that the person taking the legal estate, whether by fraud or otherwise, cannot enjoy the beneficial interest without violating the rules of honesty and fair dealing." *Legault v. Legault*, 142 Vt. 525, 529, 459 A.2d 980, 983 (1983) (internal quotation marks omitted).  Generally, Vermont courts employ constructive trusts "to avoid unconscionable results and to prevent unjust enrichment." *Weed v. Weed*, 2008 VT 121, ¶ 17, 185 Vt. 83, 968 A.2d 310.

[16] Vermont law echoes the general standard for bailments: "[A] bailment contemplates that the title shall not pass to the bailee, but remains in the bailor, and that the property shall be returned to the bailor. . . .  While the bailor retains the general ownership, the bailee has true possession as distinguished from mere custody." *Vermont Acceptance Corp. v. Wiltshire*, 103 Vt. 219, 153 A. 199, 200 (1931) (internal quotation marks omitted).

supplant state law.  *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654–55 (1995).  Nonetheless, § 514(a) of ERISA contains broad preemption language: "Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III *shall supersede any and all State laws* insofar as they may now or hereafter relate to any employee benefit plan . . . not exempt under section 1003(b) of this title."  29 U.S.C. § 1144(a) (emphasis added).  This expansive provision effectuates ERISA's purpose: to "provide a uniform regulatory regime over employee benefit plans" so that regulation of these plans is "'exclusively a federal concern.'"  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981)).  In accordance with this purpose, ERISA's preemption provision encompasses state common law causes of action that "relate[] to [an] employee benefit plan."  *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 62 (1987) (second alteration in original) (quoting ERISA § 514(a)); *see also Potter v. United of Omaha Life Ins. Co.*, Case No. 2:15-cv-53, 2015 WL 9153302, at *3 (D. Vt. Aug. 6, 2015). The Supreme Court has held that "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy[,] conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted."  *Aetna Health Inc.*, 542 U.S. at 209.

In this case, both the constructive trust and the bailment claims relate to Cooper's employee benefits plan and are thus supplanted by ERISA's civil enforcement remedy.  The trust claim depends on a common law fiduciary

relationship between PUB and Cooper, while the bailment claim requires PUB to exercise a duty of care over Cooper's property. *See Estate of Alden v. Dee*, 2011 VT 64, ¶ 17, 190 Vt. 401, 35 A.3d 950 (quoting Vt. Stat. Ann. tit. 14A § 1001) ("A violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust."); *Zweeres v. Thibault*, 112 Vt. 264, 23 A.2d 529, 533 (1942) ("[T]he bailee is liable for injury to the property in case it results from his failure to exercise due care and diligence in its preservation."). Both claims are based on Cooper's employee benefits plan and the relationship created by PUB's administration of the Chittenden Pension Plan. (Doc. 1 at 2–3.) If the Plan did not exist, PUB would owe no independent legal duty to Cooper. *See Aetna Health Inc.*, 542 U.S. at 210 ("[W]here there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)."). As PUB owes no independent legal duty to Cooper, Cooper's common law claims "duplicate[], supplement[], or supplant[] the ERISA civil enforcement remedy," and are preempted by ERISA. *Id.* at 209; *Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497, 504 (2d Cir. 2014) (noting preemption is obvious where "state laws deal[] with the subject matters covered by ERISA—reporting, disclosure, fiduciary responsibility, and the like" (emphasis and internal quotation marks omitted)).

Cooper's arguments to the contrary are not persuasive. Cooper first argues that the common law claims apply "if PUB had moved the funds out of the pension plan and into some other savings vehicle, or retained the funds for its benefit."

(Doc. 26 at 7.)  But § 502(a)(1)(B) of ERISA allows a participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan," 29 U.S.C. § 1132(a)(1)(B), thereby providing a cause of action for Cooper to seek any missing pension funds, if necessary.  *See, e.g., Nechis v. Oxford Health Plans, Inc.*, 328 F. Supp. 2d 469, 479 ("Under § 502(a)(1)(B), [t]he relief expressly provided is to secure benefits under the plan . . . ." (alteration in original) (internal quotation marks omitted)).

Cooper also contends that PUB may have denied her the ability to participate in any retirement plan, which would give rise to a separate common law claim. (Doc. 26 at 7.)  But the Complaint neither raises an allegation that Cooper was denied participation in all retirement plans, nor specifies the common law cause of action for such a claim.  *Cf.* Fed. R. Civ. P. 8(a)(2) (requiring pleading to have "a short and plain statement of the claim showing that the pleader is entitled to relief").  Because Cooper raises this claim for the first time in her opposition to PUB's Motion for Summary Judgment, the Court need not address its merits.  *See Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach merits of argument raised for first time in opposition to summary judgment).

Even if Cooper had properly raised the claim in her Complaint, she points to no facts that support it, merely speculating that further discovery might expose

relevant facts.[17]  (Doc. 26 at 7.)  To survive a motion for summary judgment, however, the opposing party "must do more than present evidence that is merely colorable, conclusory, or speculative."  *Campanaro v. City of Rome*, 999 F. Supp. 277, 279 (N.D.N.Y. 1998); *see also Anderson,* 477 U.S. at 252.  Cooper does not meet this standard.

For these reasons, PUB's request for summary judgment regarding Counts Two and Three of the Complaint is GRANTED.

## Conclusion

Based on the foregoing, PUB's Motion for Summary Judgment (Doc. 14) is GRANTED.  The Clerk shall enter judgment in favor of PUB.

Dated at Burlington, in the District of Vermont, this 15th day of March 2018.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

---

[17]  Without citing Fed. R. Civ. P. 56(d), Cooper seems to suggest that consideration of PUB's Motion for Summary Judgment should be deferred until additional discovery is conducted.  (*See* Doc. 26 at 6–7.)  But Cooper (jointly with PUB) filed a Motion to Stay Discovery Pending Ruling on the Motion for Summary Judgment.  (*See* Doc. 24.)  Cooper cannot on the one hand seek a stay of discovery while on the other hand oppose summary judgment based on a lack of discovery.  *See Housatonic Habitat for Humanity, Inc. v. Gen. Real Estate Holdings, LCC*, Case No. 3:13-cv-01888 (MPS), 2015 WL 12697640, at *2 (D. Conn. Mar. 13, 2015) ("It should have been obvious to the plaintiff that it could not simultaneously seek a stay of discovery and oppose summary judgment on the grounds that there had not been an adequate opportunity for discovery.").  Further, Cooper has not submitted an affidavit showing: "(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts."  *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999) (alteration in original) (internal quotation marks omitted).  Failure to submit such an affidavit is fatal to the claim that additional discovery is needed.  *Id*. at 44.